[No. 29028.   Department One.   July 19, 1943.]

MARY LISTON McCANN, *Appellant,* v. THE MUSICIANS'
ASSOCIATION, LOCAL No. 76, A. F. OF M.,
*Respondent.*[1]

[1]Reported in 140 P. (2d) 257.

*Sam. L. Levinson, Jay Friedman,* and *Harry G. Mc-Cain,* for appellant.

*L. Presley Gill,* for respondent.

MALLERY, J.—This is an action brought by Mary Liston McCann, widow of Larry McCann, deceased, on her own behalf, as beneficiary, to recover the sum of one thousand dollars, as death benefits from respondent, The Musicians' Association, Local No. 76, A. F. of M., of which deceased was a member. From a judgment for defendant, plaintiff appeals.

Respondent, Musicians' Association, Local No. 76, A. F. of M., hereinafter referred to as the union, is a voluntary unincorporated association, with its office in Seattle, Washington. Although the union, through its constitution and by-laws, has provided for death benefits in the sum of one thousand dollars for its members, it does not operate under the insurance code of the state of Washington, although it maintains a substantial reserve to pay these death benefits, in addition to making assessments as deaths occur.

The constitution and by-laws of the organization provide that a member must be in good standing at the time of his death in order for the beneficiary to receive the death benefits. The applicable provisions of the constitution and by-laws are as follows:

"ARTICLE XII. Death Benefit Fund. Sec. 1. Any member of this Association who shall be in good standing, or any applicant for membership who shall have complied with the requirements as to payment of his initiation, shall be entitled to the provisions of this Association of Death Benefit if he shall have complied with all the By-Laws of the Association relating thereto; provided, that no transfer member or member who has resigned from the local, or who shall have been dropped from the rolls for cause, nor honorary members who shall be carried as such simply for courtesy, excepting those honorary members carried as such on account of disability resulting from accident, sickness

or old age, shall be entitled to any provisions of this Association for the Death Benefit.

"The amount of the Death Benefit shall be One Thousand Dollars ($1,000.00) to be paid as hereinafter provided.

"Sec. 2. To be in good standing, so as to be entitled to the Death Benefit, the following provisions of the By-Laws must be complied with, viz.:

"Any member, who shall have paid his full initiation fee, must pay all dues and assessments for the current quarter during the first month of the quarter, and if any part of the current quarter's dues and assessments, or any part of any previous dues and assessments remain unpaid on the last day of the first month of the quarter, such member shall stand suspended from all rights and benefits, including the Death Benefit, until all delinquent indebtedness for dues and assessments shall have been paid in full, whereupon the member shall immediately be reinstated to all rights and benefits of the Association, including the Death Benefit. . . .

"Sec. 16. Death Assessments and Fund. Upon the death of any member, entitled to the Death Benefit, every member of this Association who is eligible to the provisions of the Death Benefit, shall be assessed One Dollar, which shall become due and payable during the first month of each quarter following the quarter within which the assessment shall have been levied."

Members of the respondent union are required to pay dues at the rate of $1.50 per quarter. In order to work, members must be in good standing. The applicable provisions in the constitution and by-laws are as follows:

"ARTICLE V. Sec. 2. Dues shall be $1.50 per quarter which, with the current death benefit assessments, must be paid during the first month of each quarter. See Art. 12, Sec. 15. The receipt therefor shall be known as the quarterly card and shall be the passport to professional business.

"Sec. 4. In addition to dues and death assessments, a 2% tax on the scheduled price of each engagement; and an additional tax of 1% from all recording engagements must be paid to office by the contractor at time of depositing Steward report.

"Sec. 5. Any members whose dues, assessments or tax are not paid in accordance with Sec. 2 shall stand suspended. When a member is suspended for non-payment of dues or fines, or fails or refuses to comply with any other demand of the Association, he shall forfeit all rights of membership until such time as all demands are fully complied with. During such suspension he shall be held amenable to all laws of the Association."

Appellant was the designated beneficiary of McCann's certificate, having been so designated on September 16, 1940. Larry McCann died on January 11, 1942, at Ketchikan, Alaska. He had been a resident of Ketchikan for more than a year prior to his death. Formal demand for these benefits was made on January 20, 1942, no issue being raised as to any procedural requirements or the form of notice. Her claim was rejected on the ground that the deceased was not a member in good standing for the fourth quarter of 1941 and the first quarter of 1942, on the ground that he was in arrears in the sum of two dollars on a death assessment.

The deceased, Larry McCann, was initiated into the respondent union on July 13, 1931, and, except for a ten-day period in 1936, wherein he was suspended for failure to pay a fine, remained a member of respondent union until his death on January 11, 1942. At the close of the year 1940, he was fully paid as to all dues and assessments and other charges of the union, and entered into the first quarter of 1941 without any preceding indebtedness or delinquency of any kind.

The constitution and by-laws of the respondent union permitted the payment of yearly dues in advance, and, if such payment were made, there was no obligation on the part of the member to pay any of the current assessments until the first quarter of the year following. The amount of the annual dues was the sum of six dollars. The applicable provision of the constitution and by-laws is as follows:

"Article V. Sec. 13. Life and Exempt members, and those paying yearly in advance, may pay all death assessments that have accrued during the year, during the month of January immediately following."

Although the officers of the respondent would normally have made the death assessment as soon as they allowed the claim for the deceased member, due to the large number of deaths from 1939 through 1941, the officers determined to prorate the assessment by imposing not more than three assessments per quarter regardless of when the deaths occurred. There were thirteen deaths in 1939, fifteen in 1940, and six in 1941. Accordingly, twelve assessments at the rate of three dollars per quarter were charged against the members during 1941. In addition, the union assumed payment for two others during 1941 from death fund without making any assessment to the members.

The procedure with relation to assessment for the death of members was as follows: Immediately after the death of a member, the executive board at a meeting would pass a motion that the benefit be paid and a death assessment levied. No date for the levy would be set and, thereafter, the members would be charged in the regular course of business at the rate of not more than three per quarter.

No method was provided in the records of the organization for determining the amount due from the members as assessments, other than a record made by the accountant at the time he appeared to audit the books for each quarter. There were apparently no minutes as to when the levy was made, except as they may be inferred from the minutes of the meeting in which the board directed the payment of the death benefit for the deceased member. A few days before the end of the quarter, the accountant would audit the books, and, if there was no record of a receipt from the member of the amount of the assessment, he would then make an entry showing this amount to be due as of the first of the

following quarter. As a matter of fact, he seldom made this entry until the beginning of the following quarter. Thus, there was no record of any assessment, nor was any made, as far as the books and records of the respondent were concerned, until after the first of the quarter following the period in which the accountant was to audit. This practice had gone on for some years.

During the first quarter of 1941, members were assessed for deaths which occurred respectively on September 7, 1940, September 11, 1940, and November 5, 1940. During the second quarter of 1941, assessments were for deaths occurring on December 28, 1940, December 1, 1940, and December 2, 1940. During the third quarter of 1941, members were assessed for deaths occurring on December 5, 1940, December 13, 1940, and January 24, 1941. During the fourth quarter of 1941, the assessments were for deaths occurring on January 28, 1941, February 8, 1941, and August 2, 1941.

Notices were sent by the respondent to its members prior to each quarterly meeting. The amount of the dues and assessments for the ensuing quarter was not segregated as dues or assessments, but was designated simply under the term "dues." All members were sent exactly the same notices, and no member was notified individually as to the balance due on his separate account.

The deceased, Larry McCann, was paid up at the beginning of the year 1941. He was not indebted for dues or any past due assessments. In January, 1941, deceased sent in the sum of six dollars, with no accompanying letter as far as the records show. If he had sent instructions that this money was to be allocated for dues in advance, this would have been done, and no further payments would have been required from him until the end of the first month of the first quarter of the following year, January 31, 1942. The allocation of this payment was not made by an

officer of the respondent, but was made by Chambers, the accountant, not a member of the respondent association. This apparently was done when he came in to audit the books at the end of the first quarter in 1941. He had no day book or memorandum as to how this six-dollar payment was to be applied. He had no instructions from any person as to whether it should be applied to the $1.50 quarterly dues and the three-dollar assessment due for that quarter, leaving a credit of $1.50 to be carried over on the following quarter's dues. He was aware of the provision in the by-laws which permitted the application of this sum as payment of dues in advance, in satisfaction of all obligations of McCann until the end of January, 1942.

Respondent admitted that such application would have permitted the beneficiary to recover without any question, as, if they had been so applied, deceased would have been in good standing at the time of his death.

The deceased, Larry McCann, according to the allocation of the six dollars determined by Chambers, entered the second quarter of 1941 with his account showing a credit balance of $1.50. Thereafter, the union entered a charge against his account of $1.50 for dues, and a three-dollar death assessment for each of the second, third, and fourth quarters of 1941. His account, therefore, as kept by the respondent, showed a balance due the union of twelve dollars at the beginning of the fourth quarter of 1941.

On November 10, 1941, the respondent received from Larry McCann from Ketchikan, Alaska, a money order in the sum of ten dollars, together with his quarterly card. No letter accompanied the payment. The union credited the ten dollars to the payment of dues in the sum of three dollars for the third and fourth quarters, after having given him credit for the $1.50 advance payment of the second quarter. Respondent credited the balance of seven dollars on the nine-dollar assess-

ments for the last three quarters, showing a balance due from McCann in the sum of two dollars as unpaid assessments. Had the six dollars received in January, 1941, been applied to dues for the entire year, this ten dollars would then be credited for an advance payment for the death assessments, which would not have been due until in January, 1942.

On receipt of the ten dollars from the deceased, the union, through its secretary, William H. Davenport, issued a receipt therefor, and marked deceased's quarterly card paid for the remaining quarters of 1941. The receipt and the quarterly card were mailed to Larry McCann with a letter upon the official stationery of the union, signed by Davenport as secretary, as follows:

"Seattle, Washington,
Nov. 10, 1941.

"Larry McCann
Box 2397
Ketchikan, Alaska
Dear Sir and Brother:

"Yours with $10.00, received.

"There were 14 deaths for 1941, of which the Association Fund paid for 2, leaving 12 for you to pay.

"You still owe $2.00 for 1941, so if you will send $8.00 more you will then be paid up for whole of 1942 for dues; then during the month of Jan. 1943 you can pay for whatever death assessments there might have accumulated and which you will be notified of along in Nov. or Dec. of 1942.

"If there should be no deaths during 1942, the $8.00 will carry you for that time. Right now we are all caught up on death assessments, Gastel being the last one.

"Fraternally yours,
W. H. Davenport
W. H. Davenport, Sec'y."

McLean, the president of respondent, and Davenport, the secretary, testified that the quarterly card, marked paid, was sent to the deceased as a working card, and that its purpose was to permit him to work as a union

member and it did not necessarily indicate that all of his assessments were paid.

However, the by-laws make no such distinction in the receipt. Art. V, § 2, provides that dues shall be $1.50 per quarter, which, with the current death benefit assessment, must be paid during the first month of each quarter. The receipt therefor shall be known as the quarterly card and shall be the passport to professional business. The by-laws further provide by Art. V, § 5, that a member is not eligible to work unless fully paid as to dues and assessments. The provisions of the by-laws and the card itself are contrary to the interpretation placed thereon by McLean and Davenport. Under the terms of the constitution and by-laws, this card is not to be issued unless both dues and assessments have been paid in full.

The appellant contends that the court erred in holding the deceased, Larry McCann, was not a fully paid member in good standing at the time of his death.

As set forth in the findings, the following is the situation with relation to the payment of dues by the deceased:

"That Larry McCann died on January 11, 1942. That during January, 1941, the deceased sent to the Union $6.00; that at that time he was a member in good standing, and owed no back dues or assessments for the year 1940. That on January 21, 1941, the Union issued its receipt and voluntarily credited said $6.00 payment, without direction by deceased, by applying $1.50 in full payment of the first quarter of 1941 dues, $3.00 on death assessments for said quarter, and credited him with $1.50 on dues to be charged for the second quarter of 1941. That said credit of $1.50 was indicated on decedent's membership card by a penciled notation in the block reserved for the second quarter's stamp. That had the $6.00 payment been credited, in accordance with Article V. Section 13 of the Union's by-laws, to a year's dues in advance, there would have been no further sums due the Union from decedent until the first month of the first quarter of 1942."

■ It thus appears that the right of the respondent to recover was defeated *by the failure of the respondent to apply the funds in its possession in such a way as to have kept the deceased in good standing* and entitled to the benefits of his organization. It was the duty of respondent to make such an application of the funds. The rule is succinctly stated in 38 Am. Jur. 513, as follows:

"Application of funds due or paid by member. It may be laid down as a general rule, subject to some exceptions, that if a mutual benefit society has in its possession sufficient funds, presently due a member, to pay dues or assessments owing by him, it is the society's duty to apply the same so as to prevent a forfeiture of the member's rights under the benefit certificate."

To the same effect, see, also, *Supreme Lodge Order of Mutual Protection v. Meister,* 204 Ill. 527, 68 N. E. 454; *Price v. Brotherhood of Railroad Trainmen,* 116 Minn. 275, 133 N. W. 793.

■ The fact that the amount received was exactly the sum required to pay the dues for the entire year in advance is very significant, and it would be a strong inference that such, in fact, was the purpose of McCann. He was not a resident of Seattle at the time these dues were paid, and not in position where he could easily ascertain the amount due in any particular quarter. He must have known that by the payment of the dues in advance he would be required to make no further payments for a year, and in making such a payment he was entitled to rely upon the fact that the officers of his fraternal organization would see to it that this sum was so applied that he would receive the greatest benefit. Such a duty is imposed upon these officers, and the respondent will not be permitted to take advantage of its own breach of duty. The advance payment was sufficient to place the deceased in good standing until the end of January, 1942. His death

having occurred on January 11, 1942, the rights of the beneficiary thereupon became fixed.

Since the ruling on appellant's two remaining assignments of error must necessarily inhere in the ruling on the first, they will not be separately discussed.

■ Respondent's by-laws provide, in part, as follows:

"ARTICLE XII. Sec. 12. Provided further, that if, in the administration of any death benefit by the Board, they shall be put to any legal expense by the raising of any legal questions, or otherwise, then such expense may be deducted from said Death Benefit, and only the balance remaining, paid by the Board to the person entitled thereto."

Respondent asks, in the event appellant prevails, that its attorney's fees and costs be deducted from the benefit to be paid.

We think the board may not arbitrarily resist the payment of death benefits with impunity. Of course, in cases, for example, where the board would be *put to* the expense of interpleading in an action between contesting beneficiaries, or where it was advisable to seek a declaratory judgment, or where they incurred expenses incident to probate proceedings and the like, such a provision in the by-laws would be given effect. Section 12 must, however, be given a strict construction, being in derogation of the rights of the beneficiary.

Therefore, in this case, where we have held that the beneficiary has a right to the benefit, it would not appear that the board was *"put to"* any legal expense. They owed the money and may not eat up the benefits by an arbitrary defense.

The judgment is reversed.

SIMPSON, C. J., MILLARD, STEINERT, and BLAKE, JJ., concur.